**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,
U.S. Department of Justice,
Antitrust Division,
450 Fifth St., NW, Suite 8000,
Washington, DC   20530

*Plaintiff*,

v.

DUKE ENERGY CORPORATION
550 South Tryon Street
Charlotte, NC   28202

*Defendants*.

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil action to obtain monetary relief in the form of civil penalties against the Defendant, Duke Energy Corporation ("Duke"), for violating Section 7A of the Clayton Act, as amended, 15 U.S.C. § 18a, also commonly known as the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR Act"), and alleges as follows:

### I. NATURE OF THE ACTION

1. The HSR Act is an essential part of modern antitrust enforcement. The HSR Act and implementing regulations require purchasers to notify the Department of Justice and the Federal Trade Commission and wait for agency review before acquiring assets valued in excess of certain thresholds. A purchaser can "acquire" assets without taking formal legal title, for instance by obtaining operational control over the assets or otherwise obtaining "beneficial ownership."

The HSR Act's notice and waiting period requirements ensure that the parties to a proposed transaction continue to operate independently during review, preventing anticompetitive acquisitions from harming consumers before the government has had the opportunity to review them according to the procedures established by Congress in the Clayton Act.  A purchaser that prematurely takes beneficial ownership of assets, sometimes referred to as "gun jumping," is subject to statutory penalties for each day it is in violation.

2. In August 2014, Duke agreed to terms to purchase the Osprey Energy Center ("Osprey") from its owner, Calpine Corporation ("Calpine"), a competing seller of wholesale electricity nationally and in Florida.  Osprey is a combined-cycle natural gas-fired electrical generating plant located in Auburndale, Florida.  Duke violated the HSR Act by obtaining beneficial ownership of Osprey before filing the required notification and observing the required waiting period.

3. Specifically, as part of the agreement to acquire the plant, Duke also entered into a "tolling agreement" whereby Duke immediately began exercising control over Osprey's output, and immediately began reaping the day-to-day profits and losses from the plant's business.  Duke, for example, assumed control of purchasing all the fuel for the plant, arranging for delivery of that fuel, and arranging for transmission of all energy generated.  Duke, not Calpine, retained the profit (or loss) from the difference between the price of the energy generated at Osprey and the cost to generate the energy, bearing all the risk of changes in the market price for fuel and the market price for energy.  Based on these potential risks and rewards, Duke, and not Calpine, decided exactly how much energy would be generated by the plant on an hour-by-hour basis, and relayed those detailed instructions each day to plant personnel.  Thus, from the moment the

tolling agreement went into effect, Osprey ceased to be an independent competitive presence in the market for generating electricity for Florida consumers.

4. Duke was never interested in a tolling agreement alone—Duke was only interested in the tolling agreement as a step in the process of purchasing the plant. As a Duke executive explained in testimony to the Florida Public Service Commission, the tolling agreement reflected an effort to obtain expedited approval for the purchase of Osprey from the Federal Energy Regulatory Commission ("FERC"). When FERC reviews a proposed power plant acquisition, it typically employs a "screen" to assess how much the proposed acquisition would increase market concentration. While planning the acquisition of Osprey, Duke and Calpine anticipated the acquisition would fail the FERC screen. But with a tolling agreement in place, Duke hoped that FERC would treat Osprey as already effectively controlled by Duke, and would therefore conclude that an acquisition would lead to no change in Duke's market share and no increase in concentration under FERC's screen. Indeed, after entering into the tolling agreement, Duke argued to FERC that its acquisition of Osprey posed no competitive threat and did not increase concentration because Duke "already controls [Osprey] pursuant to the Tolling Agreement."

5. The combination of Duke's agreement to purchase Osprey and the contemporaneously negotiated and interdependent tolling agreement transferred beneficial ownership of Osprey's business to Duke before Duke had fulfilled its obligations under the HSR Act. As a result, Duke and Calpine did not continue to act as independent entities during the required waiting period while the Department of Justice investigated the proposed acquisition and determined whether to challenge it. Therefore, the Court should assess a civil penalty against Duke for its violation of the HSR Act.

## II. JURISDICTION, VENUE, AND INTERSTATE COMMERCE

6. This Complaint is filed and these proceedings are instituted under Section 7A of the Clayton Act, 15 U.S.C. § 18a, added by Title II of the HSR Act, to recover civil penalties for violations of that section.

7. This Court has jurisdiction over the subject matter of this action pursuant to Section 7A(g) of the Clayton Act, 15 U.S.C. § 18a(g), and pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345 and 1355.

8. The Defendant has consented to personal jurisdiction and venue in the District of Columbia for purposes of this action.

9. Duke is engaged in commerce, or in activities affecting commerce, within the meaning of Section 7A(a)(1) of the Clayton Act, 15 U.S.C. § 18a(a)(1).

## III. THE DEFENDANT

10. Defendant Duke Energy Corporation is organized under the laws of Delaware with its principal office and place of business at 550 South Tryon Street in Charlotte, North Carolina. Through various subsidiaries, Duke Energy Corporation generates and sells electric power on a retail and/or wholesale basis in numerous local markets throughout the United States.

## IV. WAITING PERIOD REQUIREMENTS OF THE HSR ACT

11. The HSR Act requires parties to file a notification with the Federal Trade Commission and the Department of Justice and to observe a waiting period before consummating acquisitions of voting securities or assets that exceed certain value thresholds. The required notification gives the federal antitrust agencies prior notice of, and information about, proposed transactions. The waiting period provides the antitrust enforcement agencies with an opportunity to investigate and to seek an injunction to prevent harm from anticompetitive transactions.

12. The HSR Act requirements apply to a transaction if, as a result of the transaction, the acquirer will "hold" assets or voting securities valued above the thresholds. Section 801(c)(1) of the Premerger Notification Rules, 16 C.F.R. § 800 *et seq.*, defines "hold" to mean to have "beneficial ownership." An acquiring person may prematurely obtain beneficial ownership of assets by, among other things, assuming the risk or potential benefit of changes in the value of the relevant assets and exercising control over day-to-day business decisions of the acquired person's business before the end of the HSR waiting period. This conduct, sometimes referred to as "gun jumping," violates Section 7A of the Clayton Act.

13. Section 7A(g)(1) of the Clayton Act, 15 U.S.C. § 18a(g)(1), states that any person, or any officer, director, or partner thereof, who fails to comply with any provision of the HSR Act is liable to the United States for a civil penalty for each day during which the person is in violation. Beginning February 10, 2009, the maximum amount of civil penalty was increased to $16,000 per day, pursuant to the Debt Collection Improvement Act of 1996, Pub. L. 104-134, § 31001(s) (amending the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 note), and Federal Trade Commission Rule 1.98, 16 C.F.R. § 1.98, 74 Fed. Reg. 857 (Jan. 9, 2009). Pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, § 701 (further amending the Federal Civil Penalties Inflation Adjustment Act of 1990), and Federal Trade Commission Rule 1.98, 16 C.F.R. § 1.98, 81 Fed. Reg. 42,476 (June 30, 2016), the maximum amount of civil penalty was increased to $40,000 per day.

### V.  THE TRANSACTION AND THE DEFENDANT'S UNLAWFUL CONDUCT

14. In August 2014, Duke and Calpine reached an agreement for Duke to purchase Osprey. The parties memorialized their agreement in an August 25, 2014 term sheet. The structure of the transaction included a tolling agreement to be put into effect until the closing of the

acquisition.  Duke and Calpine executed the tolling agreement on September 30, 2014, and it became effective the next day.

15.     Tolling agreements are relatively common in the electricity industry, but the circumstances surrounding Duke's tolling agreement for the Osprey plant are not.  Duke said in testimony to the Florida Public Service Commission that there was no separate rationale to enter this tolling agreement independent of the acquisition.  Duke was only interested in the tolling agreement as a bridge to the acquisition of the plant itself.  As a Duke executive testified, the tolling agreement was a "mechanism to transfer the acquisition of the plant to [Duke]."  Duke insisted that it was only willing to enter into a tolling agreement in combination with an acquisition agreement, and only if Duke had the right to terminate the tolling agreement without penalty in the event that FERC rejected the acquisition.

16.     The tolling agreement was designed to smooth approval by FERC by enabling Duke to argue that it "already controls" Osprey through the tolling agreement and thus that no new harm could come from permitting Duke to acquire Osprey outright.  Under the tolling agreement, Duke was responsible for determining the amount of power that would be generated at Osprey, and for purchasing and delivering all the fuel necessary to produce that power.  Duke was then entitled to receive all of the electricity generated by the facility.

17.     After entering into the tolling agreement, Duke began to make all competitively significant decisions for the Osprey plant.  Each day, Duke sent hour-by-hour instructions to Osprey personnel directing them to produce a certain amount of power.  Duke also arranged to procure and deliver the necessary natural gas to Osprey—functions previously performed by Calpine.  Duke also arranged for all of the power generated at Osprey to be transmitted to its destination.  In other words, Duke decided when and how much natural gas would be delivered to

the plant and decided when and how much energy would be produced by the plant. Duke was free to make all of these decisions based on its own business interests, and Osprey's function was limited to the mechanical operation of the facility consistent with Duke's instructions. Calpine ceased to make any significant competitive decisions for Osprey.

18. The combination of the tolling agreement and the asset purchase agreement transferred market risk (or potential gain) of a change in the fortunes of Osprey's business. Duke paid Calpine a fixed monthly fee plus a small amount to reimburse the plant's variable operations and maintenance costs. Duke also assumed financial responsibility for procuring natural gas, the plant's primary input cost. Thus, it was Duke who gained the profit or loss from sale of the energy, and it was Duke who assumed all the risk that fuel prices would increase or that energy market prices would fall. Calpine was no longer exposed to any risk of changes in the fuel or energy markets.

19. Months after the tolling agreement was executed and Duke had taken beneficial ownership of Osprey, Duke submitted a notification and report form pursuant to the HSR Act concerning its intent to acquire the Osprey plant, valued at approximately $166 million. On February 27, 2015, the antitrust agencies terminated the HSR waiting period. Duke had beneficial ownership of Osprey for the entire waiting period.

### VI.   VIOLATION OF SECTION 7A OF THE CLAYTON ACT

20. Plaintiff alleges and incorporates paragraphs 1 through 19 as if set forth fully herein.

21. Duke's acquisition of Osprey was subject to Section 7A premerger notification and waiting-period requirements.

22. Duke obtained beneficial ownership of Osprey prior to making its required premerger notification and observing the applicable waiting period in violation of Section 7A.

23. Accordingly, Defendant was continuously in violation of the requirements of the HSR Act each day beginning on October 1, 2014, until the waiting period was terminated on February 27, 2015.

## VII. REQUEST FOR RELIEF

Wherefore, Plaintiff requests:

(a) that the Court adjudge and decree that Defendant violated the HSR Act and was in violation during the period of 150 days beginning on October 1, 2014, and ending on February 27, 2015;

(b) order that Defendant pay to the United States an appropriate civil penalty as provided under Section 7A(g)(1) of the Clayton Act, 15 U.S.C. § 18(a)(g)(1), and 16 C.F.R. § 1.98(a);

(c) that the Court award the Plaintiff its costs of this suit; and,

(d) that the Court order such other and further relief as the Court may deem just and proper.

Dated: January 18, 2017

*(signature)*

RENATA B. HESSE (D.C. Bar #466107)
Acting Assistant Attorney General

*(signature)*

JONATHAN B. SALLET
Deputy Assistant Attorney General for Litigation

*(signature)*

PATRICIA A. BRINK
Director of Civil Enforcement

*(signature)*

ROBERT A. POTTER
Chief
Legal Policy Section

*(signature)*

CAROLINE E. LAISE
Assistant Chief
Transportation, Energy & Agriculture Section

*(signature)*

ROBERT A. LEPORE
Assistant Chief
Transportation, Energy & Agriculture Section

Respectfully Submitted,

*(signature)*

JADE A. EATON (D.C. Bar #939629)
NJERI MUGURE
Trial Attorneys
Transportation, Energy & Agriculture Section

KARA B. KURITZ
Attorney Advisor, Legal Policy Section

U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Phone: (202) 307-6316
Facsimile: (202) 307-2784
E-mail: jade.eaton@usdoj.gov